# Morris's Appeal.

1. An assignee for the benefit of creditors is the mere representative of his assignor, enjoying his rights only, and is bound where he would be bound.

2. Parol evidence may be admitted to explain a written agreement, so far as to give identity to the subject-matter and apply the contract to it.

3. Physical annexation to realty is not necessary to convert a chattel into a fixture. Whether it be such depends much on the business for which the premises are used. If the article, whether fast or loose, be indispensable in carrying on the specific business, it becomes a part of the realty.

4. Appellees were the owners of a large manufacturing establishment in Philadelphia, called " Southwark Foundry." By a written agreement they agreed to sell to M. all said property and business, for a gross sum of $480,000. M. agreed to purchase the stock and material on hand, to pay $40,000 down, and the remainder in ten annual instalments, the payment thereof to be secured by " a purchase-money mortgage of all the real estate above mentioned, and the fixtures and appurtenances." On a given day the deeds, transfers and mortgages were delivered. The mortgage described the lands as they were described in the deeds, " together with the buildings and improvements thereon, with all the machinery, engines, boilers, railroad tracks and fixtures contained in or appurtenant to the premises." Inasmuch, however, as a bill of sale was also executed by the appellees, transferring some of the articles to M., it was claimed that the mortgage was not intended to cover them. It was shown that the articles in question were used by the appellees in carrying on their business, and that they considered them necessary for that purpose. *Held,* that the establishment was sold as a whole and bought as such for a gross sum, and the fact that when the papers were executed the consideration was divided, and part put in the deed and part in the bill of sale, could not change the character of the sale, and that whatever had received the impress of a fixture could not by this act be so dissevered as to prevent the lien of the mortgage from attaching thereto. *Held, further,* that whatever was afterwards added as necessary to the business, and used as such, in like manner became fixtures, and were equally bound by the mortgage.

January 16th 1879.  Before SHARSWOOD, C. J., MERCUR, GORDON, PAXSON, WOODWARD, TRUNKEY and STERRETT, JJ.

Appeal from the Court of Common Pleas, No. 1, of *Philadelphia county:* Of January Term 1878, No. 209.	In Equity.

This was the appeal of Henry G. Morris and C. E. Morris, his assignee, from the decree of the court enjoining said assignee from selling or removing from the Southwark Foundry the machinery, fixtures and property mentioned in a catalogue of sale issued by said assignee.

The bill was filed against appellants by John Vaughan Merrick, William Henry Merrick and John Edmund Cope.

It is admitted by the pleadings that the plaintiffs, by deed dated the 31st December 1870, granted to the defendant, Henry G. Morris, two lots of ground, namely: First, a large lot of ground, with the buildings and improvements thereon erected, situate on the south side of Washington avenue, and bounded by Fourth street, Fifth street, Federal street and Washington avenue, containing three hundred and ninety-six feet ten inches on Federal street, three hundred and ninety feet six inches on Fifth street, three hundred and twenty feet two inches on Fourth street, and four hundred and four feet two inches on Washington avenue; and secondly, a lot, with the stable thereon erected, situate at the southeast corner of Fifth and Federal streets, containing in front on Fifth street eighteen feet, and in depth eastwardly sixty-eight feet; subject, as to the first lot, to the payment of a yearly ground-rent of $6000, and as to the second lot, to the payment of a yearly ground-rent of $36; together with all the machinery, engines, boilers, railroad tracks and fixtures contained in or appurtenant to the premises first described.	That the real estate and premises so conveyed were mortgaged by the said Henry G. Morris to the plaintiffs to secure the payment of part of the purchase-money, for which his bonds were given to each of the plaintiffs separately in the sum of $146,666.66, making the total amount of the bonds and mortgage $440,000, these papers being executed simultaneously with the deed, and the mortgage duly recorded.	That a balance of $102,-666.66 of the purchase-money secured by these bonds and mortgage remains unpaid to each of the plaintiffs, and is now due and payable, and proceedings are about to be instituted to collect the same.	The defendants allege in their answers that subsequently to the filing of the bill, proceedings were instituted by the plaintiffs on the said mortgage, under which the real estate and premises above mentioned were sold by the sheriff to the plaintiffs for the sum of $291,000.

The plaintiffs allege in their bill that the premises thus conveyed to Henry G. Morris are known as "The Southwark Foundry," in which a very large and extensive business was carried on by the plaintiffs prior to, and by the said Morris since, the sale thereof to him.	That on the premises, and constituting a very valuable part of the same, are placed and erected a very large quantity of

machinery, tools and fixtures of various kinds, which are a necessary part of the foundry, and without which it could not be properly or profitably operated. That all of these are covered by the said mortgage, and constitute a very valuable part of the security for the payment of the debts due by Henry G. Morris to the plaintiffs. To this the defendant, Henry G. Morris, answers that from the 1st January 1871, until the 29th April 1875, he carried on a very large and extensive business in the premises, but that the premises were not, as he is informed and believes, conveyed to him under the name of the Southwark Foundry, and that he is advised by counsel that the mortgage given by him to the plaintiffs does not, in law, cover a large quantity of machinery and tools of various kinds which are on these premises, but which are not attached to the freehold, and many of which have been purchased by him since the execution of the mortgage. The defendant, Charles E. Morris, answers that a large number of the said machines and tools are not a necessary part of the said foundry, and that it could be properly and profitably operated without them. He denies that these machines and tools are covered by the mortgage or constitute a valuable part of the security for the payment of the debts due by Henry G. Morris to the plaintiffs, and he alleges that the premises mentioned in the mortgage are not mortgaged as the Southwark Foundry, or as constituting any part of the same. He further alleges that by a bill of sale dated the 31st December 1870, the plaintiffs, in consideration of $277,000, bargained and sold unto Henry G. Morris, his heirs, executors, administrators and assigns, all the property, machinery, engines, fixtures, tools, goods, chattels, drawings, implements, appliances and other appurtenances, owned, used or held by them in and about the engineering establishment known as the Southwark Foundry, and mentioned in two books of inventory of fixtures, tools, chattels and appliances, made for the purposes of this sale, and signed at the end thereof by the plaintiffs, and all other property, tools, goods, chattels, &c., then being in the buildings and shops erected on the large lot of ground above mentioned, and also in the stable at the corner of Fifth and Federal streets; together with all the fixtures in use and remaining on the wharf premises of the late Samuel V. Merrick, below Reed street, in this city. He further answers that he is advised and believes that the articles mentioned in this bill of sale and the two inventories are not included in or covered by the said mortgage to the plaintiffs, and are not constituent parts of the mortgaged premises, but that they were the personal property of the said Henry G. Morris.

It is further alleged by the bill, and admitted by the answers, that the said Henry G. Morris, on the 29th April 1875, by deed duly recorded, assigned all his estate and property to the defendant, Charles E. Morris, as trustee for his creditors.

The bill then alleges that the assignee has advertised for sale by public auction the personal property of the assignor, and has issued catalogues thereof, in which are contained many items included in the mortgage, and really a part of the mortgaged premises. The answers admit the advertisement of the sale and the issuing of the catalogues, but deny that the catalogues contain any items included in the mortgage, or anything which was really a part of the mortgaged premises, or appurtenant thereto.

The prayers of the bill are: 1st. For an injunction restraining Charles E. Morris, the assignee, from selling or removing from the foundry, any of the machinery, engines, boilers and fixtures appurtenant to said premises, and constituting part of the said foundry. 2d. For an injunction restraining him from proceeding with the sale, until it be ascertained under the direction of the court, what are the items of property upon the mortgaged premises, which constitute a necessary part of the same, and which shall not be sold by him as the personal property of the said Henry G. Morris. 3d. Further relief.

On the filing of the bill on the 24th June 1875, a special injunction was granted, and by an interlocutory order made on the 28th June 1875, the injunction was continued until further order, and the cause was referred to W. J. McElroy, as examiner and master, to report the facts, the law and the form of a decree.

The master made a voluminous report, and found, inter alia, the following facts:

"That the Southwark Foundry was an engineering establishment, covering a large extent of ground, with substantial and capacious buildings, and embracing within it a machine shop, brass and iron foundry, boiler shop, smith shop, pattern shop, carpenter shop, drawing room and erecting shop, with the requisite machinery, tools and appliances for carrying on these various, but connected branches of the business.

"In the fall of the year 1870, negotiations took place between the plaintiffs and the defendant, Henry G. Morris, relative to the sale and purchase of this engineering establishment, and on the 31st of October 1870, the purchase was concluded upon the terms which are set forth in the agreement in writing, which recites that Henry G. Morris has purchased from William H. Merrick and John E. Cope, trading as Merrick & Sons, and from J. Vaughan Merrick, the Southwark Foundry, used and occupied by the firm in their business as manufacturers, and all the business, good-will, contracts, patents, licenses to use patented articles, fixtures, machinery, tools, &c., belonging to said firm, useful in the said business, and appurtenant thereto, or to the said premises known as the Southwark Foundry, and also a certain stable and lot of ground thereinafter mentioned, for the sum of $480,000, payable as thereinafter mentioned; and has also agreed to purchase the stock and material

which may be in the hands of the said firm on the 31st day of December next, upon the terms and at the valuation thereinafter particularly set forth and mentioned.

" It further recites the intention of the parties, that Henry G. Morris shall receive and be vested with a good and perfect title to the real estate, subject to the yearly ground-rent of $6000 on the foundry property, and the yearly ground-rent of $36 on the stable property, and also with a good and perfect title in all and singular the estate, property, chattels, machinery, tools, contracts, patents, licenses to use patented articles, engines, fixtures, &c., used by the said firm in their business aforesaid, and necessary or appurtenant thereto.

" The parties then agree:

" That the plaintiffs will, on the 31st December 1870, convey to Morris, his heirs and assigns, by a good and marketable title, in fee simple, clear of all encumbrance other than the yearly ground-rent of $6000, the large lot of ground, with the improvements and buildings thereon erected, situate on the south side of Washington avenue, the east side of Fifth street, the north side of Federal street, and west side of Fourth street, together with the appurtenances.

" That the plaintiffs will on the same day execute to Morris such deeds, assignments, transfers and other instruments of writing as shall vest in him, his executors, administrators and assigns, a good and perfect title to all and singular the goods and chattels, tools, patterns, machinery, drawings, fixtures, implements, appliances and other appurtenances whatsoever, owned and held by the said Merrick & Sons, and used in and about the engineering establishment of the said Merrick & Sons, and known as the Southwark Foundry, together with all and singular the fixtures in use and remaining on the wharf premises of the late Samuel V. Merrick, below Reed street.

" Henry G. Morris agrees to pay to William H. Merrick and John E. Cope, trading as aforesaid, and J. Vaughan Merrick, the sum of $480,000, in manner following: $40,000 on the 31st December 1870, on the delivery of the deeds and other instruments of writing above agreed to be executed, and the remaining $440,000 in ten annual instalments, with interest at six per cent., payable half yearly.

In order to secure the payments thus agreed to be made, Henry G. Morris agrees to execute and deliver to William H. Merrick, John E. Cope and J. Vaughan Merrick, 'as tenants in common of equal undivided interests, a purchase-money mortgage of all the real estate above mentioned, with the fixtures and appurtenances;' the mortgage to be accompanied by three bonds and warrants of attorney, each for $146,666.66⅔, payable in ten equal annual instalments, with interest payable half yearly.

[Morris's Appeal.]

" Henry G. Morris agrees to purchase from William H. Merrick and John E. Cope, trading as aforesaid, all the stock of material, manufactured, unmanufactured, and in process of manufacture, at its fair market value, to be ascertained by the parties, or in case of dispute, by a referee, mutually chosen, $40,000 of the price to be secured by his notes maturing in four months, and the balance by notes at twelve months after date, with interest on said balance.

This agreement was acknowledged on the 31st October 1870, by all the parties, for the purpose of record, but does not appear to have been in fact recorded.

The sale made by this agreement was carried into effect on the 31st December 1870, by the execution of the following papers :

1. A deed was executed by the plaintiffs with their respective wives, to Henry G. Morris, in fee, for the real estate mentioned and described in the first and second articles.

2. Two inventories of the machinery, tools and fixtures mentioned were signed by the parties. A bill of sale for these was executed by the plaintiffs to Henry G. Morris.

3. Three bonds were executed by Henry G. Morris, one of them to each of the plaintiffs severally, for the payment of $146,666.66 each, in ten equal annual instalments, with interest thereon, payable half yearly.

4. A mortgage to secure the payment of these bonds was executed by Henry G. Morris to the plaintiffs, in the sum of $440,000.

An inventory was also made of the manufactured and unmanufactured material, but was not completed until March 1871. It amounted to $74,492.67, which amount has been paid by Mr. Morris.

The deed from the plaintiffs to Henry G. Morris conveys to him in fee, in consideration of $203,000, the large lot of ground, with the buildings and improvements thereon erected, bounded by Washington avenue, Fifth street, Federal street and Fourth street, subject to the yearly ground-rent of $6000, and also the lot, with the stable erected thereon, at the southeast corner of Fifth and Federal streets, subject to the yearly ground-rent of $36 ; " together with all the machinery, engines, boilers, railroad tracks and fixtures contained in, or appurtenant to, the premises first above described."

The first inventory, labelled " Buildings and Tools," contains a list of machinery, consisting of planing machines, punching machines, cranes, oscillating, horizontal and vertical engines, drilling machines, &c. It also contains, at the end of the foregoing list, an inventory and valuation of buildings, enumerating the land and various buildings erected thereon, on each of which a value is placed, amounting in the aggregate to $285,500. On the last page of the book is the following memorandum : " The foregoing inventory of machinery, fixed or appurtenant to the premises, is hereby

accepted as correct, unless the same be amended prior to the first day of February 1871." This is signed by the plaintiffs and Henry G. Morris, and is dated December 31st 1870.

The other inventory, labelled "Tools and Fixtures," contains scales, hydraulic jacks, jack screws, &c., and a great many miscellaneous tools. It includes the tools in the fire-proof store-room on the second floor machine shop. It also includes a cast iron core oven, an overhead double-track railway, a large number of tool closets, a railroad track scale and two cart scales, located at the gates of the foundry, and some other articles which are attached to the freehold. It also includes horses, wagons, harness and various articles belonging to and in use in the stable. On the last page of this book is the following memorandum: "The foregoing inventory of chattels, &c., is hereby accepted as correct, unless the same be amended prior to the first day of February 1871." This is signed by the plaintiffs and Henry G. Morris, and is dated December 30th 1870.

The bill of sale recites the purchase, by Mr. Morris, from the plaintiffs, of the Southwark Foundry, and that it is the intention of the parties that he should "receive and be vested with a good and perfect title in all and singular the property, chattels, machinery, tools, engines, fixtures, &c., used by the said firm in their business aforesaid, and necessary or appurtenant thereto." The consideration is stated to be the sum of $277,000, and for that consideration the plaintiffs bargain, sell, grant and confirm unto Henry G. Morris "all the property, machinery, engines, fixtures, tools, goods, chattels, drawings, implements, appliances and other appurtenances whatsoever, owned, used and held by them in and about the engineering establishment known as the Southwark Foundry, and mentioned and expressed, or intended so to be, in two certain books of inventory of fixtures, tools, chattels, appliances, &c., lately made for the purposes of this sale, and signed at the end thereof, on the date hereof," to hold the same to the said Henry G. Morris, his heirs, executors, administrators and assigns for ever.

The mortgage from Mr. Morris to the plaintiffs, after reciting his execution of the three bonds or obligations to them severally for the sum of $146,666.66 each, witnesses, that in consideration of these three debts, amounting to $440,000, and for the better securing the payment thereof, with interest, to them, severally, he grants to them in fee the large lot of ground with the buildings and improvements thereon erected, and the smaller lot, with the stable erected thereon, subject to the ground-rents, "together with all the machinery, engines, boilers, railroad tracks and fixtures contained in, or appurtenant to the premises first above described," and recites that these are the same premises which they, "by indenture bearing even date, but duly executed and acknowledged immediately before these presents, for the consideration-money therein

mentioned, which is hereby secured," granted and conveyed to him in fee.

The master further finds that:

" The sale thus made to Mr. Morris by the plaintiffs was a sale of the Southwark Foundry as a unit for a gross sum of $480.000.

" No special estimate was made of the value of the different parts of the establishment, nor was there on the books of the plaintiffs any statement of the cost of the land, buildings and tools as separate items.　There was an improvement account to which was charged everything which was added to the establishment from time to time, whether buildings, machinery, fixtures or tools, of whatever description.　The entire cost of the establishment could thus be ascertained, but not the separate cost, nor the appreciation or depreciation in value of any of its separate parts.　No attempt was made, in the negotiations for the sale, or in carrying it out, so far as the evidence discloses, to place a value on any of the machinery, tools or fixtures.　The valuations of the land and buildings in the inventory amounting to $285,500. are not connected in any way with the terms of sale, and differ from the consideration of $203,000 mentioned in the deed.　This latter amount was fixed upon as the value of the ground and buildings. without anything else.　The remainder of the purchase-money, $277,000, was represented by the articles included in the two inventories, but in making the sale and purchase, the plaintiffs did not ask Mr. Morris, nor did he agree to give these, or any, separate prices for the land and buildings, and for the articles named in those inventories.　The price was a round sum for the whole—$480,000 for the entire establishment, except the material and unfinished stock.　There was no agreement to sell by inventory.

" Two of the inventories were made under the direction and management of Mr. Robert Briggs, who acted for Mr. Morris.　Neither the plaintiffs, nor any one acting for them, took part in the making of these lists.　They were made by Mr. Morris for his own convenience, information and security, and were accepted by the plaintiffs as correct at the time for all the property passing under the deed and mortgage.

" The other inventory, which included the stock of material and unfinished work, was, on the contrary, made by an agent of the plaintiffs.　This was agreed to be purchased by inventory, at a valuation to be ascertained and fixed, and to be paid for according to this valuation.

" Mr. Briggs had been manager for Messrs. Morris, Tasker & Co., of which firm Mr. Henry G. Morris had been a member, for about seven years.　In the matter of this purchase of the Southwark Foundry, he acted as his friend and adviser, with the expectation of becoming manager of the foundry, and he did in fact act as its manager under Mr. Morris until the time of his failure.　He

had full knowledge of the negotiations for this purchase, and was consulted by Mr. Morris in those negotiations.   He was called as a witness for the plaintiffs, and from his testimony the following facts appear: The purchase was made from the plaintiffs for a round sum, $480,000, with a kind of inventory, not a very perfect one. It included all the real estate fixed and attached to the property, everything upon the premises necessary to put the works into immediate use, all the workmen's tools, the entire equipment of the establishment, and was described in certain deeds then given and in a certain inventory or bill of sale.   The inventory was incomplete and imperfectly made.   Large quantities of material and fixed and quasi-fixed machinery were not named or described in it, but everything upon the premises was conveyed or intended to be sold and conveyed to Mr. Morris.   Of the purchase-money, $40,000 was paid in cash; the balance of the $480,000 was to be paid in yearly instalments of $44,000 each, to be secured by bond and mortgage of the property sold and conveyed.   As to this mortgage, it was understood between the parties that the mortgage should be made to cover, as far as possible, everything that was necessary for the carrying on of the work in its regular way at the Southwark Foundry.   The preparation of the papers was left to the legal advisers of the plaintiffs on this point, and they were assented to by Mr. Morris to cover what was necessary to carry on the works.

"One of the plaintiffs also testified that the understanding and agreement between them and Mr. Morris was that the mortgage should cover all the machinery, tools, &c., of different kinds, which were essential for carrying on the business, and which did not pass under the title of stock inventory and unfinished account; in other words, everything except what was contained in the inventory.

"Thirteen policies of insurance against fire, amounting to $78,000, which had been held by the plaintiffs, were on December 31st 1870, assigned by them to Mr. Morris, and they were then endorsed at his request by the agents of the several companies, 'Loss, if any, payable to Merrick & Sons, mortgagees.'   Another policy was taken out by Mr. Morris on October 20th 1871, for $10,000, and similarly endorsed to plaintiffs as mortgagees.   These policies covered not merely the buildings, such as the erecting shop, machine shop, &c., but also the machinery, fixtures, patterns, tools, implements, shafting and belting contained therein.   The premiums on all these policies were regularly paid by Mr. Morris up to the time of his failure.

On, or prior to, the 29th April 1875, Mr. Morris became insolvent, and on that day executed to the defendant, Charles E. Morris, a general assignment of all his estate and property in trust for the benefit of his creditors.   The assignee took possession, under this

assignment, of the Southwark Foundry, with all its contents, and advertised for sale by public auction at the foundry on the 25th June 1875, a large number of the tools, implements and machines contained therein. The catalogues issued by the auctioneer embraced over 1100 items, many of which were, however, articles of finished work, lots of scrap iron and steel, office furniture and other articles which were manifestly personal property and not covered by or subject to the lien of plaintiff's mortgage. These were, by the agreement of the parties, relieved from the effect of the injunction, and were afterwards sold by the assignee for the benefit of Mr. Morris's creditors. Nearly 800 items of the catalogue have been in this way eliminated from the controversy, leaving over 300 items remaining in dispute between the parties.

During the time that Mr. Morris was carrying on the business of the foundry he made alterations and improvements in some of the buildings, and introduced new machinery into the foundry, at a cost of $118,431.86. Much of this new machinery took the place of that formerly in use, and all of it was attached to the freehold except the portable drill presses, harness chains, core-oven carriages, transfer carriages, travelling crane and new truck for main track. The drill presses are operated by being fastened to fixed machinery, and the travelling crane weighs fifty or sixty tons. The only portion of this new machinery which is included in the catalogue is the core-oven carriages, or some of them, but which of them the testimony leaves indefinite.

The testimony of several experts was taken as to the character of the machinery, tools and implements claimed by the plaintiffs, and their necessity in or adaptation to the working of the foundry. It is not deemed necessary to refer here in detail to this testimony.

After the bill in this case was filed, proceedings were instituted by the plaintiffs on their said mortgage, and under these proceedings the premises described in the mortgage were sold by the sheriff, and purchased by the plaintiffs at the sale for the sum of $291,000, and a deed therefor has been duly executed by the sheriff to them.

The position of the plaintiffs is that all of the remaining articles of the catalogue of sale are covered by the mortgage, and conveyed by it to them as security for the unpaid purchase-money.

The defendants contended that none of these articles, and indeed no article included in the inventories made by Briggs are covered by the mortgage.

In support of these claims, the plaintiffs, on the one side, gave evidence to show that the articles claimed by them as mortgaged to them are essentially fixtures of the foundry, that many of them are parts of fixed machines, or constructed to be used by and in connection with fixed machinery; that others are made for special classes of work done by the establishment; that others, although tools used by the workmen, and unconnected with fixed machinery,

[Morris's Appeal.]

are of such a character that the foundry could not be carried on without them, or without making and substituting for them articles of the same kind and description; that others, such as patterns, flasks, drawing-boards and tables, and trucks, are essential and necessary for such an establishment, without which the business could not be prosecuted or even started; that all of these articles are not only useful but requisite for the conducting of the business sold to Henry G. Morris by the plaintiffs; that if a majority of them were removed from the foundry it would be impracticable to execute a single order, and that while a few articles of a certain character might be removed without serious detriment, yet the removal of a few of the others would render it impossible to run the establishment for a single day.

On the other hand, the defendants gave evidence to show that certain of the catalogued articles—namely, all such as are not physically fastened to the premises, or a necessary component part of some machine so attached to the premises, are not constituent parts of the Southwark Foundry; that while many of the other articles are absolutely essential to the running of the business of that foundry profitably and economically, many others are not necessary for that purpose; and that nearly all of the articles claimed by the plaintiffs could be removed, and yet the premises would be technically a foundry.

The defendants also insisted that the deed, mortgage and bill of sale in evidence, plainly show the intention of the parties to have been to grant on the one part and mortgage on the other only the land, buildings and such fixtures as were permanently attached to the freehold; that they treated all else as personal chattels, not included in the deed or mortgage, by the execution of a bill of sale and their memoranda at the end of the inventories; and that no parol evidence can be considered which tends to vary the legal effect of these papers, nor can the agreement of sale be examined to ascertain the intention of the parties, as that was merged in the papers afterwards executed in pursuance of it.

As to this the plaintiffs insisted that all the evidence given for the purpose of showing what the parties actually intended to accomplish by the execution of the papers is proper for consideration, and that this question of intention being an important one in determining this case, it is essential to a conclusion upon it to know not only what the parties did, but what they said in making their agreements and in executing the papers necessary to carry these agreements into effect.

The questions of law were discussed at great length by the master, his findings, in brief, being as follows:

"1. As respects the position of the parties. The fact that Henry G. Morris has made an assignment for the benefit of his creditors to the other defendant, Charles E. Morris, can have no

effect on the rights of the plaintiff. The assignment is his own voluntary deed, to which they were neither parties nor privies. The assignee merely represents him, not the creditors. He stands ' on the foot' of his assignor, is bound by his agreements, and is affected by all the equities which existed against the property in the hands of the assignor, enjoying his rights and no others : Twelves *v.* Williams, 3 Whart. 485 ; Vandyke *v.* Christ, 7 W. & S. 373 ; Mellon's Appeal, 8 Casey 121. This case must therefore be considered as if it were simply between the plaintiffs on the one side and Henry G. Morris on the other. In other words, it is a case between mortgagor and mortgagee.

" 2. As to the question whether the articles claimed by the plaintiffs are fixtures, irrespective of the evidence as to the intention of the parties to include them in the mortgage as security to the plaintiffs for the unpaid purchase-money. The articles claimed by the plaintiffs as included in their mortgage (with some slight exceptions) were placed by the owners in the various shops composing the Southwark Foundry for permanent and habitual use in the work of that foundry, and very nearly all of them have been actually used in it. I can have no doubt of the intention with which they were placed here. Many of them were made especially for the purpose for which they are used. None of them were put there temporarily. All of them were intended to perform some part of the operations of the foundry, and the weight of the evidence is that the business there carried on cannot be carried on as it has been without them. One of the defendants' experts, Mr. Longstreth, testified that if he were to purchase this foundry as a unit, for a lumping sum, with the intention of continuing the same business, he would expect to get from the vendors everything which they had in use while they conducted the business. There can be no question about the fact that every piece of machinery, implement and tool placed in this foundry was so placed with the intention that it should remain there and not be used for any purpose not in connection with the business of the foundry, so long as it answered, or could be made, by repair and otherwise, to answer the purpose designed.

" 3. As to the question of the intention of the parties to include the articles claimed by the plaintiffs in the mortgage executed to them as security for the unpaid purchase-money. It is not necessary in the present case to decide that the mortgage would, as against a judgment or execution-creditor of the mortgagor, be held valid for the benefit of the plaintiffs and to the extent claimed by them, for there is no such creditor to assert any rights against them. Here the question, as already said, arises between the original parties to the transaction, and the effect to be given to their agreement is not influenced by any considerations which might arise if other liens had been acquired, or the rights of third parties had intervened. My conclusion from the evidence in this case is, that

[Morris's Appeal.]

the parties intended and agreed to include in the mortgage which the plaintiffs should receive, as a security for the unpaid purchase-money, all the machinery, tools, implements and appliances contained and used in the foundry which they sold and conveyed to Mr. Morris, or in the words of Mr. Briggs, ' everything that was necessary for the carrying on of the work in its regular way at the Southwark Foundry;' and that this intention was carried into effect by Mr. Morris in the execution by him to the plaintiffs of the mortgage in question, which must in equity be taken, as against him and his assignee, to cover and include all these articles which he thus intended to convey to them as their security. Any other conclusion must, as it seems to me, be inequitable and unjust."

The master reported the form of a decree wherein the defendants were perpetually enjoined "from selling or removing from the Southwark Foundry any of the machinery, fixtures or property mentioned in the catalogue of sale issued by the assignee," except certain enumerated articles. And further ordered that the assignee pay the costs. A number of exceptions were filed to these findings which the court dismissed, and confirmed the report. The defendants then took this appeal, their numerous assignments of error being in brief, that the court erred in holding that the sale to Morris was a sale of the Southwark Foundry as a unit for a gross sum; in admitting the parol testimony to show what was covered by the mortgage; in deciding that it was the owners' intention to annex the articles to the manufactory was the true test whether they were fixtures or not; in holding that the assignee cannot be permitted to deny that the land, buildings and fixtures mentioned in the deed and mortgage were those of the Southwark Foundry; in deciding that the bill of sale manifestly included things which were granted by the deed as real estate; in holding that certain enumerated articles are parts of the machinery necessary for carrying on the business of the Southwark Foundry, and therefore covered by the mortgage; in deciding that it was proper and necessary to look beyond the papers and instruments to ascertain the intent not to vary these instruments, but to reach the real meaning of those who executed them.

In deciding that all of the items of the catalogue of sale, except certain articles numbered, are, by the agreement and intention of the parties to the said mortgage, part of the machinery and fixtures contained in and appurtenant to the premises first therein mentioned and described, and necessary for the carrying on of the business there conducted; that they were, according to that agreement and intention, conveyed to the plaintiffs by the said mortgage, as security to them for the unpaid purchase-money, and that they must, therefore, in equity, be treated as included in said mortgage, and subject to its lien, and in not dissolving the injunction.

[Morris's Appeal.]

*Henry J. McCarthy* and *William A. Porter*, for Charles E. Morris; and *Lewis Waln Smith*, for Henry G. Morris.—It would seem clear from all the facts, and under the authorities, that when the parties separated in the execution of the papers between real and personal estate, and conveyed the one by deed and took a mortgage upon that, the transfer of the other by the bill of sale and inventories operated as a severance of all that was included in those inventories and turned it into personalty : Ewell on Fixtures 310 ; Begbie *v.* Fenwick, L. R. 8 Ch. App. 1075, n. (1866) ; s. c. 24 L. T. (N. S.) 58 ; 25 L. T. (N. S.) 441 ; Folsom *v.* Moore, 19 Maine 252 ; Fortman *v.* Goepper, 14 Ohio St. 558.

It is most confidently urged, therefore, that the intention of the parties is to be ascertained from the written instruments. The court below erred in not applying that simple test, and in not deciding that the articles of the catalogue claimed by the appellees passed to Henry G. Morris, and through him to his assignee, as personal property, and are not covered by the mortgage.

When a contract has been reduced to writing, evidence of conversations of previous negotiations cannot be given in opposition to the written memorandum. The latter must be understood as the expression and final understanding of the parties : Monongahela Navigation Co. *v.* Fenlon, 4 W. & S. 208 ; Mumford *v.* McPherson, 1 Johns. 418 ; Vandervort *v.* Smith, 2 Caines 161 ; Fortman *v.* Goepper, 14 Ohio St. 558.

The Southwark Foundry was not mortgaged *eo nomine*, or as a manufactory. This is a matter of much moment in this case. It is an admitted fact that neither the deed nor the mortgage make any reference to the Southwark Foundry. The word manufactory, or its equivalent, is not to be found in either paper.

The natural inference to be deduced from the facts is, that the parties had no intention of mortgaging anything but real estate. If they had intended to mortgage those things which belonged essentially to the Southwark Foundry as a manufactory or engineering establishment, instead simply of conveying the land by metes and bounds, they would have used some general word in the instrument to carry that intention into effect. Even if the Southwark Foundry had been mortgaged *eo nomine*, such a mortgage would not pass to the appellees the thousand loose tools, patterns, goods, and chattels in the foundry.

*George Junkin* and *Alexander Henry*, for appellees.—This is a matter of contract rather than of lien. An assignee for the benefit of creditors is not a purchaser : Kent, Santee & Co.'s Appeal, 6 Norris 165. He claims through his assignee, and his rights rise no higher : Ritter *v.* Brendlinger, 8 P. F. Smith 68 ; Missimer *v.* Ebersole, 6 Norris 109 ; Luckenbach *v.* Brickenstein, 5 W. & S. 145.

Testimony was not offered to alter or contradict the words of the

mortgage. It was not to show that no machinery or fixtures were "contained in and appurtenant to the premises," but what those words were intended to cover by the parties to the instrument.

Parol evidence may be given to explain a written agreement, so far as to give locality and identity of the subject-matter, and apply the contract to it: Bertsch *v.* Lehigh Coal and Nav. Co., 4 Rawle 130; Nixon *v.* McCallmont, 6 W. & S. 159; Gould *v.* Lee, 5 P. F. Smith 99; Clarke *v.* Adams, 2 Norris 309; Greenwalt *v.* Kohn, 4 Id. 375.

In the present case, it will be seen that the whole "establishment" was a unit, composed of its various and complicated parts. The various machines and tools, and implements, whether actually fast or loose, were as the master finds them to have been as a matter of fact, essential to the integrity of the foundry. And while, in very many instances, it could exist and be carried on as a foundry without them, yet it would not then have been *the foundry* which was sold by the Messrs. Merrick & Cope, and which H. G. Morris pledged to them for the balance of the purchase-money.

The vendor and mortgagees are entitled to hold their *whole security* in its integrity.

Mr. Justice MERCUR delivered the opinion of the court, May 5th 1879.

The appellant is an assignee in trust for the benefit of creditors. He is, therefore, the mere representative of his assignor, enjoying his rights only, and is bound where he would be bound: Wright et al. *v.* Wigton, 3 Norris 163.

The contention here is to be considered solely as between Henry G. Morris, assignor, of the one part, and the appellees of the other part. No rights of subsequent purchasers or of creditors are involved. The main question is, whether the parties to the mortgage, at the time of its execution, intended it to cover the property now in controversy. The master found they did so intend. The court, with slight modification, confirmed the finding and decreed accordingly. Although numerous errors have been assigned, they all relate to this one. The court below having agreed with the master as to the facts, their conclusion should not be reversed unless error therein is reasonably apparent.

When not restrained by any technical rule of law, a court should so interpret a contract as to give effect to the true intention and understanding of the parties when it was executed. While parol evidence may not, as a general rule, be received to contradict or vary the written terms in which the contract was expressed, yet such evidence of the existing and surrounding circumstances may be given to aid in ascertaining the true intent of the parties. Hence it may be admitted to explain a written agreement, so far as to give identity to the subject-matter and apply the contract to it:

Bertsch *v.* Lehigh Coal & Nav. Co., 4 Rawle 130; Barnhart *v.* Riddle, 5 Casey 92; Jackson *v.* Litch, 12 P. F. Smith 451.

The relative rights of the parties in the present case to the property in controvery, arose under the following general circumstances: The appellees were the owners and occupiers of a large manufacturing establishment called "Southwark Foundry," in the city of Philadelphia. In fact it was an extensive engine manufactory, covering a whole square of ground, with large and substantial buildings, including a machine shop, brass and iron foundry, boiler shop, smith shop, pattern shop, carpenter shop, drawing room and erecting shop, with the requisite machinery, tools and appliances for carrying on these various but connected branches of business. By written agreement, dated the 31st October 1870, they declared that Henry G. Morris had purchased from them all said property and business, and they agreed to convey the same to him on the 31st December next following by good and lawful deeds, assignments and transfers; and also a certain stable and other lot of ground, in the contract described, for the sum of $480,000. Morris also agreeing to purchase the stock and materials which the appellees might have on hand, on said 31st December, at a valuation to be ascertained. That on the delivery of the deeds and transfers he should pay $40,000, and the remaining $440,000 in ten annual instalments, with interest, the payment thereof to be secured by "a purchase-money mortgage of all the real estate above mentioned, with the fixtures and appurtenances." On the day designated therefor the deeds, transfers and mortgage were duly executed and delivered. The mortgage describes the lands as they are described in the deeds "together with the buildings and improvements thereon, with all the machinery, engines, boilers, railroad tracks and fixtures contained in or appurtenant to the premises."

Inasmuch, however, as a written instrument or bill of sale was also executed by the appellees, transferring to Morris some of the articles now in contention, it is claimed that the mortgage was not intended to cover them. The correctness of this view depends on what did the parties understand to be fixtures? Physical annexation to realty is not necessary to convert a chattel into a fixture. Whether it be such depends much on the business for which the premises are used. Articles necessary or convenient in the transaction of one kind of business, would be useless in another. If the article, whether fast or loose, be indispensable in carrying on the specific business, it becomes a part of the realty: Voorhis *v.* Freeman, 2 W. & S. 116; Pyle *v.* Pennock, Id. 390; Ege *v.* Kille, 3 Norris 333.

It is shown that the property in question, except some few articles that Morris afterwards added, was used by the appellees in carrying on the business in which they were engaged. They considered the several items necessary for that purpose. They agreed to

[Morris's Appeal.]

sell, and Morris agreed to buy, at the same time and by the same instrument, the premises and business in which the articles were used, with the articles themselves. As the appellees had used, and appropriated, and treated as fixtures, as a necessary part of their extensive manufacturing establishment, so they sold it, and so Morris bought it. It was sold as a whole and bought as a whole. The gross sum of $480,000 was the consideration for the whole. The fact that when the papers were subsequently executed, the consideration was divided and part put in the deed and part in the bill of sale, cannot change the character of the sale. Whatever had received the impress of a fixture could not by this act be so dissevered as to prevent the lien of the mortgage from attaching thereto. Whatever Morris afterwards added as necessary to the business and used as such, in like manner became fixtures, and were equally bound by the mortgage.

It is manifest that although the property sold, as well as the property mortgaged, was composed of various parts, yet those parts were united in their operations, and were intended to be used, and were actually used, in effecting one general purpose. The "purchase-money mortgage" to secure the unpaid portion of the purchase-money, was intended to cover all the property purchased in connection with the premises. As the rights of no third persons have intervened, there is no legal impediment in the way of giving full effect to the contract, and we thereby prevent the true intent of the parties thereto from being thwarted. The learned judge committed no error in enjoining against the removal.

Decree affirmed, and appeal dismissed at the costs of the appellant.

Justices TRUNKEY and STERRETT dissented.